1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | Case No.  1:13-cv-01544-DAD-SKO |
| Plaintiff, | |
| v. | **FINDINGS AND RECOMMENDATION THAT PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT BE GRANTED** |
| ZORIA FARMS, INC., and Z FOODS INC., | **REDACTED** |
| Defendants. | (Docket No. 52) |
| _____/ | |

## I.    INTRODUCTION

On March 2, 2016, Plaintiff U.S Equal Employment Opportunity Commission ("Plaintiff") filed a motion for default judgment against Defendant Z Foods dba Zoria Farms ("Defendant"). (Doc. 52; *see also* Doc. 57 (supplemental briefing).)  No opposition to Plaintiff's motion was filed. (*See* Docket.)   Following a review of the motion and all supporting documentation, the Court deemed this matter suitable for decision without oral argument pursuant to Local Rule 230(g), and the hearing on the motion set for May 4, 2016, was vacated.

For the reasons set forth below, the Court RECOMMENDS that Plaintiff's motion for default judgment be GRANTED against the Defendant in the amount of $ 4,470,000.

## II.   BACKGROUND

**A.   Factual Background**

On September 24, 2013, Plaintiff filed a complaint against Zoria Farms, Inc. ("Zoria Farms") and its successor, Z Foods, Inc. ("Z Foods") (collectively, "Defendants") alleging violation of Title VII of the Civil Rights Act of 1964, as amended.   Zoria Farms was a wholesale processor of dried fruit, maintaining a facility in Madera, California.   Plaintiff alleges Defendants' supervisors continually sexual harassed female employees during the course of their employment and subjected employees to retaliation for opposing the harassment.

Plaintiff alleges that in 2007, Martin Ramirez, a supervisor for Zoria Farms, began subjecting Rosa Mendez to sexual harassment including but not limited to "hugging her from behind, grabbing her buttocks, rubbing her arm, following her, telling her that she was pretty and making comments regarding her physical appearance."   (Doc. 1, ¶ 20.)   Ramirez similarly subjected Rosario Huerta and other female employees to unwelcome verbal comments and conduct of a sexual nature, such as telling them they were pretty, he wanted to have sex with them, and if they slept with him they would get a better post. (Doc. 1, ¶¶ 22-23.)

In April 2008, Eder Cruz Ortiz, Jose Dieguez, and several other employees presented their complaints regarding Ramirez' behavior in a meeting with the Zoria Farms' human resources manager and plant manager.   (Doc. 1, ¶ 26.)

In June 2008, Z Foods took over operations and ownership of Zoria Farms' Madera facility.   Workers who were previously employed by Zoria Farms were rehired by Z Foods, including John Zoria, the previous owner, and Jill Brooks, plant manager.   (Doc. 1, ¶ 27.)

In 2008, Francisco Guerra, who was employed as a fresh fruit supervisor with Zoria Farms since at least 2000 and subsequently with Z Foods in 2008, subjected Rocio Guevara to sexual harassment, including but not limited to placing harassing telephone calls where Guerra asked Guevara to go on dates with him, making numerous comments about Guevara's body, telling Guevara that he was in love with her, offering to promote Guevara if she went out with him, having other female employees proposition Guevara to have a sexual adventure with Guerra at work, invading Guevara's personal space by standing directly behind her as she worked, and

1  leering at Guevara.  (Doc. 1, ¶ 29.)

2        Guerra also subjected other female employees to sexual harassment, including but not

3  limited to identifying which female employees were good at oral sex, discussing sexual positions,

4  commenting about female employees' physical appearances, propositioning female employees

5  with promotions in exchange for sex, threatening other female employees that their continued

6  employment with Defendants would be dependent on their acquiescence to his advances, leering at

7  female employees' buttocks, subjecting female employees to unwanted touching, and enlisting

8  other employees to solicit female employees on his behalf.  (Doc. 1, ¶ 31.)

9        Plaintiff also maintains that employees Eder Cruz Ortiz, Miereye Torres, Rosa Mendez,

10  Jose Dieguez, Rosaria Guerta, Maria Sara Coronado, and Barcilia Alvarez were retaliated against

11  for their opposition to unlawful harassment in that they were not rehired after the sale to Z Foods.

12  (Doc. 1, ¶ 33.)  Defendants terminated Arnulfo Guevara after and as a result of his sister Rocio

13  Guevara's opposition to sexual harassment.   After Arnulfo Guevara filed a charge of

14  discrimination, Defendants terminated the employment of Carols Garcia (Arnulfo Guevara's

15  brother-in-law) in retaliation for Arnulfo Guevara's charge of discrimination.  (Doc. 1, ¶ 34.)

16        Rosa Mendez, Rocio Guevara, Rosario Huerta, Mireye Torres, Eder Cruz Ortiz, Jose

17  Dieguez, Maria Sara Coronado, Barcilia Carina Barajas Alvarez, Arnulfo Guevara, and Carlos

18  Garcia (collectively and individually "Charging Parties") filed charges of discrimination with the

19  EEOC alleging Defendants violated Title VII.   On July 29, 2011, the EEOC issued Letters of

20  Determination finding that Charging Parties Rosa Mendez, Rocio Guevara, Rosario Huerta, Maria

21  Sara Coronado, Mireye Torres, and other similarly situated individuals were subjected to unlawful

22  employment discrimination based on their sex (female) in violation of Title VII.  (Doc. 1, ¶ 15.)

23  On that same day, the EEOC also issued Letters of Determination finding Charging Parties Eder

24  Cruz Ortiz, Jose Dieguez, Barcilia Carina Barajas Alvarez, Mireye Torres, Rosa Mendez, Rosario

25  Huerta, Maria Sara Coronado, and other similarly situated individuals were subjected to retaliation

26  for their opposition to unlawful employment practices in violation of Title VII.  (Doc. 1, ¶ 16.)

27  Finally, the EEOC issued further Letters of Determination finding that Charging Parties Arnulfo

28  Guevara, Carlos Garcia, and other similarly situated individuals were subjected to retaliation for

their association with individuals opposing unlawful employment practices in violation of Title VII.  (Doc. 1, ¶ 17.)

**B.**     **Procedural Background**

After the complaint was filed, Defendants were served (Docs. 8, 9), but only Zoria Farms filed an answer (Doc. 12).  Z Foods did not respond to the complaint.  A scheduling conference was held on March 13, 2014, and a schedule was issued opening discovery on March 18, 2014.  (Doc. 16.)  On April 30, 2015, Plaintiff and Zoria Farms settled the claims against Zoria Farms, and a consent decree was issued on June 23, 2015.  (Doc. 36.)

On March 2, 2016, Plaintiff filed a motion for default judgment against Z Foods, seeking judgment in the amount of $1,470,000, which includes an offset for the settlement amount received from Zoria Farms.  No opposition was filed by Z Foods.

### III.     LEGAL STANDARD

Federal Rule of Civil Procedure 55(b) permits a court-ordered default judgment following the entry of default by the clerk of the court under Rule 55(a).  It is within the sole discretion of the court as to whether default judgment should be entered.  *See Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

Prior to assessing the merits of a motion for default judgment, a court must confirm that it has subject matter jurisdiction over the case and personal jurisdiction over the parties as well as the adequacy of service on the defendant.  *In re Tuli*, 127 F.3d 707, 712 (9th Cir. 1999).  If these preconditions are satisfied, the court then turns to consider the seven discretionary factors set out by the Ninth Circuit in *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  The *Eitel* factors include (1) the possibility of prejudice to the plaintiff, (2) the merits of the plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.  *See id.*  Once a party's default is entered, the well-pleaded allegations of the complaint relating to a defendant's liability are taken as true.  *See Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1992).  An entry of default, however, does not overcome

4

1  the absence of essential facts within the pleadings and those legally insufficient to prove a claim.

2  *See Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).

3      A plaintiff is required to prove all damages sought in the complaint.  *See Televideo Sys.,*

4  *Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1992).  In addition, any relief sought may not be

5  different in kind from, or exceed in amount, what is demanded in the complaint.  Fed. R. Civ. P.

6  54(c).   The court, however, has discretion to consider competent evidence and other papers

7  submitted with a motion for default judgment to determine damages.  *See Televideo Sys., Inc. v.*

8  *Heidenthal*, 826 F.2d at 917.

9                          **IV.    DISCUSSION**

10 **A.     Jurisdiction and Service of Process**

11      The Court has subject matter jurisdiction over this case because Plaintiff raises claims

12 under federal law -- i.e., Title VII of the Civil Rights Act of 1964.

13      Federal Rule of Civil Procedure 4(h)(1)(A) governs service on corporate entities, such as

14 Defendant, and requires that service on a corporate entity be made either in the manner prescribed

15 by Rule 4(e)(1) for serving an individual personally or by "following state law for serving a

16 summons in an action brought in courts of general jurisdiction in the state where the district court

17 is located or where service is made [.]"   Alternatively, Rule 4(h)(1)(B) permits service of a

18 corporate entity by personally "delivering a copy of the summons and of the complaint to an

19 officer, a managing or general agent, or any other agent authorized by appointment or by law to

20 receive service of process and -- if the agent is one authorized by statute and the statute so requires

21 -- by also mailing a copy of each to the defendant[.]"

22      Under Delaware law:

23      . . . service of legal process upon any corporation of this State shall be made by
        delivering a copy personally to any officer or director of the corporation in this
24      State, or the registered agent of the corporation in this State . . .

25 Del. Code Ann. Tit. 8, § 321(a).  Defendant is a Delaware corporation and its registered agent for

26 service of process in the State of Delaware is National Registered Agent.  (Doc. 58-1, Exhs. C, D.)

27 Defendant was served on January 14, 2014, through its authorized agent to accept service of

28 process:  Frances Burris was personally served at 160 Greentree Drive, Dover, Delaware.  (*See*

                                         5

1  Doc. 8-1.)   *See   also*   https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx

2  (registered agent information maintained by the Secretary of State for Delaware).

3  Additionally, a corporation may be served in a judicial district of the United States by

4  delivering a copy of the summons and of the complaint to an agent authorized by appointment or

5  by law to receive service of process pursuant to Rule 4(h).  Fed. R. Civ. P. 4(h)(1)(B).  Therefore,

6  Plaintiff's service upon National Registered Agent, Defendant's authorized agent to accept service

7  of process, was also sufficient under Rule 4(h).

8  As the events alleged in the complaint took place within this judicial district, venue in the

9  Eastern District of California is proper.

10  **B.     The *Eitel* Factors Favor Entry of Default Judgment**

11  As discussed below, many of the *Eitel* factors favor entry of default judgment in this case.

12  **1.     The Possibility of Prejudice to the Plaintiff Favors Default Judgment**

13  Defendant has not filed an answer or otherwise defended the action, has not obtained

14  counsel, and has not responded to the request for entry of default, the entry of default, or the

15  instant motion.  In light of Defendant's failure to participate in the action, absent entry of default

16  judgment, Plaintiff would be without another recourse for recovery against Defendant.  F.*T.C. v.*

17  *Hope for Car Owners, LLC*, No. 2:12-CV-778-GEB-EFB, 2013 WL 322895, at *2 (E.D. Cal. Jan.

18  24, 2013); *PepsiCo, Inc. v. Cal Security Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).

19  Therefore, Plaintiff would be prejudiced if the Court were to deny its application for default

20  judgment.  This factor weighs in favor of default judgment.

21

22  **2.     The Merits of Plaintiff's Claims and the Sufficiency of the Complaint Favor Default Judgment**

23  As to the second and third *Eitel* factors, Plaintiff's substantive claims appear meritorious

24  and its complaint is sufficiently pled.  Plaintiff alleges retaliation in violation of Title VII of the

25  Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and Title I of the Civil Rights Act of 1991.

26  **a.     Successor Liability Sufficiently Pled**

27  Plaintiff alleges that Defendant is jointly and severally liable with Zoria Farms for Zoria

28  Farms' unlawful discriminatory conduct which occurred prior to Defendant's purchase of the

1   company in June 2008.  Successor liability turns on the facts of the particular case.  *EEOC v.*

2   *MacMilan Bloedel Containers*, 503 F.2d 1086, 1090-91 (6th Cir. 1974) ("We emphasize that the

3   liability of a successor is not automatic, but must be determined on a case by case basis").  "There

4   are three principal factors bearing on the appropriateness of successor liability for employment

5   discrimination:  (1) the continuity in operations and work force of the successor and predecessor

6   employers, (2) the notice to the successor employer of its predecessor's legal obligation, and (3)

7   the ability of the predecessor to provide adequate relief directly."  *Bates v. Pac. Maritime Ass'n*,

8   744 F.2d 705, 709-10 (9th Cir. 1984).

9       The complaint alleges Defendant used the same personnel as Zoria Farms, including Zoria

10   Farms' owner John Zoria and Plant Manager Jill Brooks.  The complaint also alleges that

11   Defendant retained members of Zoria Farms' upper management, continued operations at the

12   same facility, performed the same type of business as its predecessor, and employed substantially

13   the same employees as Zoria Farms.

14       The complaint also alleges that Z Foods had notice of potential liability for sexual

15   harassment and retaliation for successor liability through notice of charges of discrimination filed

16   with the EEOC against Zoria Farms.  Plaintiff cites *EEOC v. Global Horizons, Inc.*, 860 F. Supp.

17   2d 1172, 1186-87 (D. Hawaii 2012), noting that the court concluded notice of EEOC charges was

18   sufficient to establish notice of the predecessor's legal obligations and satisfied the second *Bates*

19   factor.  Given that Defendant ratified and continued the discriminatory conduct alleged in the

20   complaint, equity favors a finding that Defendant is liable both for its own conduct and for that of

21   its predecessor Zoria Farms.  *See EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.3d 1086,

22   1092 (6th Cir. 1974) ("It is to be emphasized that the equities of the matter favor successor

23   liability because it is the successor who has benefited from the discriminatory employment

24   practices of its predecessor").

25       The third factor assesses whether the predecessor employer is available to provide relief, as

26   opposed to the successor.  *Bates*, 744 F.2d at 710.  If the successor, rather than the predecessor, is

27   more available to provide relief, this favors the imposition of successor liability.  In *Bates*, this

28   was a close question.  The successor claimed the plaintiffs had an adequate remedy available from

1 the predecessor company, as it still remained an active employer.  The court found this might have

2 been sufficient if the plaintiffs had only sought monetary and injunctive relief for themselves.

3 However, they sought class-wide relief that extended to employees who had been hired by the

4 successor.

5 Here, the complaint alleges the predecessor employer, Zoria Farms, was sold and even its

6 owner was hired on by Z Foods.  (Doc. 1, ¶ 27.)  Defendant retained most of the Zoria

7 Farms' employees (*id.*, ¶ 27) and appears better able to provide monetary relief than Zoria Farms

8 as it pertains to conduct that occurred prior to the acquisition of Zoria Farms in June 2008.

9 Though Zoria Farms was able to pay a monetary settlement of the claims against it and therefore is

10 not completely unable to provide monetary relief, "[t]he primary concern . . . is to provide the

11 discriminate with *full relief*.  Such relief may be awarded against the successor."  *MacMillan*, 503

12 F.3d at 1092.

13 Plaintiff has also alleged that the right to control operations and employees *as well as* the

14 actual control of operations and employees has fully passed to Defendant.  This supports an

15 inference that predecessor employer Zoria Farms does not retain these powers and is unable to

16 provide full monetary relief.  *Global Horizons*, 860 F. Supp. 2d 1172.  The settlement and

17 responsive pleadings filed by Zoria Farms further bolster a finding that Zoria Farms is unable to

18 provide adequate remedies: Zoria Farms "sold all of its assets to Defendant Z Foods, which

19 became effective June 5, 2008, and ceased operating at such time and dissolved shortly thereafter"

20 in September 2008 (Doc. 12, p. 1); the settlement money came from the personal accounts of John

21 and Nina Zoria, the owners of Zoria Farms (Doc. 36, p. 4); and the injunctive remedies of the

22 consent decree only go into effect upon John and Nina Zoria becoming owners and operators of

23 another business as Zoria Farms is no longer in operation (*id.*, p. 12.)

24 In sum, the weight of the evidence and the factual allegations of the complaint support a

25 finding that predecessor employer Zoria Farms is unable to provide full relief and that the third

26 prong in *Bates* weighs in favor of imposing successor liability on Defendant.

27 //

28 //

8

**b.      Plaintiff Sets Forth Prima Facie Claims for Sexual Harassment**

Title VII of the Civil Rights Act makes it unlawful for employers to discriminate on the basis of sex with respect to the terms and conditions of employment. 42 U.S.C.2000e-2(a)(1). Discriminatory conduct includes harassment (*see e.g., Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986)) when that harassment occurs because of sex. *See Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 80-81 (1998) (stating that Title VII only prohibits harassment which occurs because of sex, regardless of whether the harasser is the same sex as or opposite sex from the victim).

A hostile environment sexual harassment claim is stated where the employee shows (1) that he or she was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) this conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Ellison v. Brady*, 924 F.2d 872, 875 (9th Cir. 1991).

Plaintiff alleges two supervisors employed by Defendant sexually harassed various female employees.  Plaintiff alleges the sexual harassment of several female employees by supervisor M:

> 20.  Martin Ramirez worked as a dried fruit supervisor at [Zoria Farms] in the Madera facility.  In 2007, Mr. Ramirez began subjecting Rosa Mendez to sexual harassment, including but not limited to hugger her from behind, grabbing her buttocks, rubbing her arm, following her, telling her that she was pretty and making comments regarding her physical appearance.  Mr. Ramirez further offered Ms. Mendez a better position in exchange for sex.
>
> 21.  This conduct was unwelcome by Ms. Mendez and she complained to [Zoria Farm's] human resource manager but no corrective action was taken.
>
> 22.   Mr. Ramierz similarly subjected Rosario Huerta and other female employees to unwelcome verbal comments and conduct of a sexual nature.
>
> 23.  Such comments by Mr. Ramirez included, but were not limited to, telling female employees that they were pretty, he wanted to have sex with them, and if they slept with him they would get a better post.
>
> 24.   Mr. Ramirez further subjected female employees to unwelcome conduct, including but not limited to, hugging and kissing female employees, following female employees to the bathroom, staring at female employees, and sending unwanted gifts to female employees.
>
> 25.  Several female employees complained to their immediate supervisors and to human resources about sexual harassment.  Defendants failed to take

appropriate remedial action in response to these complaints and subjected these employees to retaliation, including but not limited to termination.

(Doc. 1, ¶¶ 20-25.)

Plaintiff also alleges the sexual harassment of several female employees by supervisor Francisco Guerra:

29.  Since at least 2000, Defendants employed Francisco Guerra as a fresh fruit supervisor.   In 2008, Mr. Guerra subjected Rocio Guevara to sexual harassment, including but not limited to the following conduct: harassing telephone calls in which Mr. Guerra asked Ms. Guevara to go on dates with him, numerous comments about Ms. Guevara's body, telling Ms. Guevara that he was in love with her, offering to promote Ms. Guevara if she went out with him, having other female employees proposition Ms. Guevara's personal space by standing directly behind her as she worked, and leering at Ms. Guevara.

30.  Ms. Guevara complained to her supervisor in September 2008 about Mr. Guevara's conduct.  Defendants failed to take corrective action in response to the complaint.

31.   Throughout his employment with Defendants, Francisco Guerra also subjected other female employees to sexual harassment, including but not limited to the following conduct:  Guerra identified which female employees were good at oral sex, Guerra discussed sexual positions, Guerra commented about female employees' physical appearances, Guerra propositioned female employees with promotions in exchange for sex, Guerra threatened other female employees that their continued employment with Defendants would be dependent on them acquiescing to his advances, Guerra leered at female employees' buttocks, Guerra subjected female employees to unwanted touching, and Guerra enlisted other employees to solicit female employees on his behalf.

32.  Defendants failed to exercise reasonable care to prevent and promptly correct the sexual harassing behavior, including but not limited to failing to provide information to its employees regarding sexual harassment and the company procedures for complaining about harassment.

(*Id.*, ¶¶ 29-32.)

In 2008, Plaintiff alleges that Defendant took over operations and ownership of the Madera facility in place of predecessor employer Zoria Farms.  Workers who were previously employed by Zoria Farms were rehired by Defendant, including owner John Zoria and plant manager Jill Brooks.  (*Id.*, ¶ 27.)  Plaintiff alleges the following with respect to Defendant's acquisition of Zoria Farms in 2008:

9.   All of the acts and failures to act alleged herein occurring prior to September 2008 is attributable to Defendants Z Foods as a successor to Zoria Farms[,] Inc.

10

10.  Z Foods continued operations at the same facility and performed the same type of business as its predecessor Zoria Farms[,] Inc.  Defendant[ ] Z Foods also employed a substantial number of the same employees as its predecessor, including the previous owner of Zoria Farms[,] Inc. and plant manager.

11.  Z Foods had notice of potential liability as upper management retained by Z Foods knew of the complaints of sexual harassment and retaliation, including the charges of discrimination filed with the Commission.

12.  Prior to its acquisition, Z Foods was aware that charges of discrimination had been filed against Zoria Farms.

(*Id.*, ¶¶ 9-12.)  These allegations sufficiently establish a prima facie case of sexual harassment on the part of Defendant.

First, Plaintiff sufficiently alleges that Defendant employed both Ramirez and Guerra while they were engaged in the complained-of conduct, and that they were supervisors overseeing the employees who complained of harassment.  Specifically, Ramirez worked as a dried fruit supervisor and Guerra was the supervisor of the fresh fruit section.  (*Id.*, ¶¶ 20, 29.)  Where a supervisor with immediate authority over the employee harasses that employee, the employer is presumptively liable.[1]  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  Plaintiff alleges Ramirez and Guerra subjected female employees to sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.  (Doc. 1, ¶¶ 20, 22-24, 29, 31.)  Plaintiff alleges this conduct was unwelcomed by the female employees upon whom it was imposed.  (*Id.*, ¶¶ 22, 30.)  The nature of the conduct alleged sufficiently establishes it was severe as well as pervasive.  The complaint sets forth a prima facie claim for sexual harassment on the part of Defendant's supervisors.

## c.      Retaliation Claims Are Sufficiently Pled

Plaintiff also alleges that Defendant retaliated against some employees under Title VII.  Title VII makes it unlawful for an employer to discriminate against an individual because he "has opposed any practice made an unlawful employment practice" by Title VII, or because "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a).   To establish a prima facie case of retaliation in violation of Title VII, a plaintiff must show that (1) he engaged in a protected activity; (2) his

---

[1] The Court notes that although an employer may still avoid liability through affirmative defenses, Defendant has asserted no affirmative defenses and the allegations of the complaint are presumed true at this stage.

employer subjected him to an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 646 (9th Cir. 2003). "To show the requisite causal link, the plaintiff must present sufficient evidence to raise the inference that [the] protected activity was the likely reason for the adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).

Further, Title VII liability is premised on "some connection with an employment relationship." *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 883 (9th Cri. 1980). With limited exceptions related primarily to prospective employers and applicants for employment, the employer charged with discrimination under Title VII must have been the plaintiff's employer at the time of the alleged discrimination for the plaintiff to prevail. *See City of L.A. v. Manhart*, 435 U.S. 702, 718 n.33 (1978) (Title VII "primarily govern[s] relations between employees and their employer, not between employees and third parties").

Plaintiff alleges the following with regard to retaliation by Z Foods against employees who complained about Ramirez' and Guerra's conduct:

> 26.  In April 2008, Eder Cruz Ortiz, Jose Dieguez, and other employees presented complaints about Ramirez' behavior towards female employees at a meeting with  [Zoria Farms] human resource manager and management, including Jill Brooks.

> 27.  In June 2008, Z Foods took over operations and ownership of the Madera facility.  Workers who were previously employed by [Zoria Farms] were rehired by Z Foods, including John Zoria, the previous owner of [Zoria Farms] and Jill Brooks.

> 28.   The workers who organized the meeting and complained about Ramirez's conduct in April 2008 were not rehired because of their opposition to Ramirez's harassment.

> [ . . . ]

> 33.  Defendants retaliated against Eder Cruz Ortiz, Mireye Torres, Rosa Mendez, Jose Dieguez, Rosario Huerta, Maria Sara Coronado, and Barcilia Alvarez for their opposition to unlawful harassment by failing to rehire them.

> 34.  Defendants retaliated against Arnulfo Guevara and Carlos Garcia. Defendants terminated Arnulfo Guevara after and as a result of his sister Rocio Guevara's opposition to sexual harassment.  After Arnulfo Guevara filed a charge of discrimination, Defendants subsequently terminated Carlos Garcia (Arnulfo Gueva[ra's] brother-in-law) in retaliation for Arnulfo Gueva[ra's] charge of discrimination.

1    (Doc. 1, ¶¶ 26-28, 33-34.)

2        Plaintiff sufficiently alleges that employees engaged in protected activity by reporting the

3    harassing behavior to supervisors and their employer.  (*Id.*, ¶¶ 25-26 (reporting Ramirez' conduct

4    to supervisors and management), ¶ 30 (reporting Guerra's conduct).)  *Brooks v. City of San Mateo*,

5    229 F.3d 917, 928 (9th Cir. 2000) (reporting sexual harassment to supervisor constitutes protected

6    activity).

7        Plaintiff alleges that Defendant, under a theory of successor liability, took adverse

8    employment actions against the complaining employees, including selectively failing to rehire

9    those employees who reported harassment at the April 2008 meeting.  The complaint also alleges

10   that Carlos Garcia was terminated in retaliation for his association with Arnulfo Guevara, who had

11   complained about Guerra's treatment of Rocio and was subsequently terminated.  (Doc. 1, ¶ 34.)

12   As it pertains to Garcia and Guevara, this allegation is sufficient to establish prima facie third-

13   party retaliation claims.  *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173-75 (2011) (third-

14   party retaliation claim stated where employee was fired due to fiancé's claim of discrimination

15   filed with EEOC against the employer).

16       Finally, Plaintiff alleges that the adverse employment actions were caused by the

17   employees engaging in protected activity.  The decision to terminate and not rehire those

18   employees who complained about Ramirez' conduct at the April 2008 meeting occurred in June

19   2008.  Causation can be inferred from timing alone where the adverse employment action follows

20   the protected activity very closely in time.  *Passantino v. Johnson & Johnson Consumer Prods.,*

21   *Inc.*, 212 F.3d 493, 507 (9th Cir. 2000) (noting that causation can be inferred from timing alone);

22   *see also Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir. 1989) (prima facie case of

23   causation was established when discharges occurred forty-two and fifty-nine days after EEOC

24   hearings); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (prima facie case where

25   adverse actions occurred less than three months after complaint was filed, two weeks after charge

26   first investigated, and less than two months after investigation ended).  Plaintiff has sufficiently

27   stated retaliation claims against Defendant.

28   //

1  Regarding the substantive merits of Plaintiff's claims, Plaintiff and predecessor employer
2  Zoria Farms engaged in discovery and ultimately Plaintiff was able to obtain a settlement.   In
3  addition, Plaintiff has assembled declaration evidence regarding the nature of the claims against
4  Defendant.  In light of the discovery, and the settlement with predecessor employer Zoria Farms,
5  there is substantive merit to Plaintiff's claims.  This factor weighs in favor of entry of default
6  judgment.

7  **3.      The Sum of Money at Stake Favors Default Judgment**

8  The Fourth *Eitel* factor considers the amount of money at stake in the action.   *Eitel*,
9  782 F.2d at 1472.  When the money at stake "is substantial or unreasonable, default judgment is
10  discouraged."  *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1100 (N.D. Cal. 2014) (citation omitted).
11  "However, when the sum of money at stake is tailored to the specific misconduct of the defendant,
12  default judgment may be appropriate."  *Id.* (internal quotation marks and citation omitted) (finding
13  plaintiff's request for $2 million in statutory damages reasonable because the statute permitted it).
14  Plaintiff seeks $1,470,000 against Defendant, which is substantial.   Nevertheless, the damages
15  sought represent an amount that is permitted by statute for employers of less than 500 employees,
16  such as Defendant.

17  Pursuant to 42 U.S.C. § 1981a, in an action brought by a party under 42 U.S.C. § 2000e-5
18  or 2000e-16 against a party who engaged in unlawful and prohibited intentional discrimination,
19  the complaining party may recover compensatory and punitive damages which, "in the case of a
20  respondent who has more than 200 and fewer than 501 employees in each of the 20 or more
21  calendar weeks in the current or proceeding calendar year, [is] $200,000."  42 U.S.C. § 1981a.

22  While the actual award of the maximum statutory damages is subject to proof, as discussed
23  below, the amount sought by Plaintiff is not greater than that provided by statute.   Thus, while
24  substantial, it is not unreasonable.  This factor does not weigh against entry of default judgment.

25
26  **4.      There is Little Possibility of a Dispute Concerning the Material Facts
         Which Favors Default Judgment**

27  As to the fifth factor, there is no dispute of material fact.  Indications that there is a dispute
28  of material fact can weigh against entry of default judgment.  *See Eitel*, 782 F.2d at 1471-72.

14

Here, Defendant has not disputed any of Plaintiff's contentions since Defendant failed to respond to either the Complaint or this motion, and all material facts pled in the Complaint are supported or explained by a declaration.

**5.     It is Unlikely Default Was the Result of Excusable Neglect Which Favors Default Judgment**

Considering the sixth factor, it is unlikely that default was the result of excusable neglect. This action was filed over eight months ago and the docket reveals that Defendant was properly noticed of this action by substitute service over three months ago.   In addition, Defendant was served with a copy of the motion for default judgment.  Defendant failed to respond despite these notifications.  This factor weighs in favor of default judgment.

**6.     Policy Favoring Merits Decisions Does Not Outweigh Factors Favoring Default Judgment**

Finally, the seventh factor supports a default judgment because although federal policy favors decisions on the merits, *see Eitel*, 782 F.2d at 1472, this policy, standing alone, is not dispositive, especially where a defendant fails to appear or defend itself in an action.  *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177; *see Hartung v. J.D. Byrider, Inc.*, No. 1:08-cv-00960-AWI-GSA, 2009 WL 1876690, at *5 (E.D. Cal. June 26, 2009).   Accordingly, although there is a strong policy favoring decisions on the merits, this general policy is outweighed by the more specific considerations of this case and the motion to enter default judgment should be granted.

Accordingly, the Court RECOMMENDS that Plaintiff's Motion for Default Judgment be GRANTED.

**C.     Plaintiff's Request for the Statutory Maximum Amount in Damages Should Be Granted**

Plaintiff seeks the maximum statutory award against Defendant for the acts of discrimination and retaliation against the nine Charging Parties.

**1.     Successor Liability**

Although the discriminatory conduct of supervisor Ramirez and the retaliatory termination of all employees involved in the April 2008 meeting occurred before Zoria Farms was sold to Defendant, Plaintiff maintains Z Foods is nonetheless liable under the doctrine of successor liability.   As discussed above, Plaintiff has adequately pled facts sufficient to establish successor

1   liability.   Since those facts are taken as true pursuant to the entry of default, imposition of

2   successor liability on Defendant for conduct occurring prior to its June 2008 purchase of Zoria

3   Farms is appropriate.  Damages may be properly awarded against Defendant for conduct occurring

4   prior to June 2008.

5           **2.**       **Evidence Supporting Damages**

6         Damages under Title VII may be recovered from a respondent who engaged in unlawful,

7   intentional discrimination in the form of compensatory and punitive damages.   42 U.S.C.

8   § 1981a(a)(1).  In addition, monetary damages as well as injunctive relief strive to make whole the

9   persons injured by discriminatory conduct and to restore them as fully as possible to the position

10  they otherwise would have been absent discrimination.  *Franks v. Bowman Transportation Co.*,

11  424 U.S. 747, 763-64 (1976).

12        Compensatory damages may be awarded for "future pecuniary losses, emotional pain,

13  suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary

14  losses."  42 U.S.C. § 1981a(b)(3).  A victim's testimony alone is a sufficient basis on which to

15  award compensatory damages for emotional pain and suffering.  *Chalmers v. City of L.A.*, 762

16  F.2d 753, 761 (9th Cir. 1985).

17        There is a statutory cap for compensatory and punitive damages.   42 U.S.C.

18  § 1981a(b)(3)(A).  This cap is determined by the number of persons employed by the defendant

19  "in each of 20 or more calendar weeks in the current or preceding calendar year."  *See* 42 U.S.C.

20  § 1981a(b)(3)(A)-(D).  In the case of an employer who has more than 200 and fewer than 501

21  employees in each of 20 or more calendar weeks in the current or preceding calendar year,

22  damages may not exceed $200,000.  42 U.S.C. § 1981a(b)(3)(C).

23          **a.**      **Declaration of Rosa Mendez**

24        Rosa Mendez began working at Zoria Farms in July 1998 in a seasonal position as a sorter.

25  (Doc. 53-3, ¶ 2.)  In 2000, she was promoted to be a permanent employee and transferred to the

26  dried fruit department.  In 2006, Ramirez became the supervisor of the dried fruit department, and

27  was responsible for promoting and disciplining employees.  Mendez stated that Ramirez began to

28  harass her every day.  He made inappropriate comments of a sexual nature, such as comments

1   about how she looked or how good she looked in her pants.  Ramirez also told her that he'd had

2   dreams about having sex with her.   Mendez states Ramirez constantly made inappropriate

3   comments to her such as telling her that she had a beautiful body; he liked how her buttocks

4   looked in her pants; that he desired her breasts; he looked at how her breasts moved when she

5   walked by him; and that he was imagining her naked.  When Ramirez saw Mendez during the day,

6   he would tell her that he thought about what it would be like to have sex with her, that he wanted

7   to be her husband, and that he was jealous of her husband and that Mendez should be with

8   Ramirez instead.

9       Mendez also states that Ramirez would touch her inappropriately while she was at work.

10  When co-workers were present, Ramirez would walk by and brush up against her or stand next to

11  her, rubbing up against her.  When co-workers were not present, he would come up from behind

12  and either grab her buttocks or fondle her breasts.  Ramirez often propositioned Mendez telling her

13  that he would offer her a better employment position if she were with him sexually.   Ramirez

14  regularly called Mendez' cell phone, and as a result of his constant calls, Mendez had to change

15  her cell phone number at least three times.

16      Ramirez also sent Mendez to isolated areas at work so that he could further harass her.

17  Mendez was terrified that he would rape her because she had heard rumors that Ramirez had raped

18  other female employees in similar, isolated areas.  In these isolated areas, Ramirez would grab her

19  from behind with both hands.  Mendez was forced to yell for help, an employee would always

20  arrive, and Ramirez would run away.

21      Ramirez would follow Mendez after work in his truck.  On one occasion, Ramirez tried to

22  block her path with his truck to force her to stop.  On another occasion, he followed Mendez all

23  the way to her house.

24      As a result of Ramirez' conduct, Mendez experienced feelings of anxiety and stress which

25  caused her to have sleep difficulties and recurring nightmares.  Although she reported the conduct

26  to human resources manager Martha Sanchez, Ramirez increased his conduct and Mendez became

27  depressed because nothing was being done to help her.  Mendez' feelings of depression, sadness,

28  anxiety, stress, helplessness, and humiliation continued.  Upon complaining to Ms. Sanchez a

second time, Ramirez ceased his harassment for two weeks, but then resumed.  As a result,

Mendez' emotional health continued to deteriorate:

> 21.  I felt helpless and humiliated[] because Ramirez was continuing to harass me, and no one was doing anything to help me.  In addition, I began to have deeper feelings of depression and cried multiple times per week.  When I would wake up in the morning, I would feel anxious and my body would tense up at the thought of going to work.  I did not feel[] like doing anything, including getting ready for the day or going to work.  When I finally forced myself to go to work, all I wanted to do was go home and be alone.  I also began to withdraw from my friends and my family.  I felt like no one cared about me and that life was no longer important.  At one point, in October 2007, my feelings of depression were so great that I attempted to commit suicide.

In March 2008, Mendez complained to Ms. Sanchez and Jill Brooks, the plant manager,

about Ramirez' behavior.  Mendez told them Ramirez was trying to send her to an isolated area

and that she refused to go because she knew he was going to try to sexually assault her.  Mendez

was told by Ms. Sanchez and Ms. Brooks that she was insubordinate for refusing to obey Ramirez'

orders, and Mendez was written up for leaving her work station without a valid reason and for

refusing to obey her supervisor's orders.  Mendez complained to Zoria Farms' owner, John Zoria,

but nothing was done about the situation.

In April 2008, Eder Cruz Ortiz and Jose Antonio Dieguez, both employed at Zoria Farms,

organized a meeting so that employees could talk to management about Ramirez' conduct.

Mendez and others spoke at the meeting about Ramirez' conduct, and thereafter Ramirez was

fired.  In May or June 2008, employees were told that Zoria Farms was going to close for a few

days while they installed new machinery and that employees would be called back to work when

they had finished installing the machinery.   In June 2008, Mendez received a call from Ms.

Sanchez that there was no more work for Mendez.  When Mendez picked up her final pay check,

she was confused to see all her co-workers working because Mendez had been told there was no

more work.  Mendez soon learned that all her co-workers who had participated in the April 2008

meeting – Dieguez, Ortiz, Coronado, Torres, and Barajas – had been fired.  Mendez described the

changes she has undergone as a result of Ramirez' conduct:

> 40. . . . I am no longer the friendly person I once was.  Rather, beginning in or around 2007, I became more isolated from both friends and family.  I no longer wanted to go out like I previously did, and I felt that I could not trust anyone.  My

relationships with those close to me changed, and they continue to be negatively affected to this day.  Indeed, I think my withdrawal contributed, at least in part, to the breakdown of my marriage.

41.  In addition, I am no longer the happy person I once was.  Beginning in or around 2007, I began to feel depressed and cry frequently.  I felt like no one cared about me and that life was no longer important.  I also did not feel like doing anything, and instead, preferred to be alone.  In addition, I had thoughts of suicide, and tried to commit suicide in October 2007.  While I no longer suffer from daily feelings of depression, I continue to feel depressed multiple times per week.  I also continue to cry at least twice daily.

42.  In[] addition, I am not as calm as I once was.  Beginning in 2007, I began to experience feelings of anxiety and stress.  As a result of these feelings, I sometimes felt that I could not breathe and my hands would being to tremble.  Indeed, in March 2008, as a result of Ramirez' harassment and management's failure to help me, I suffered from a panic attack.  I also had, and continue to have, difficulties sleeping and recurring nightmares about Ramirez.

43.  Lastly, beginning in 2007, I also began to feel humiliated and helpless.  I felt humiliated by Ramirez's constant harassment.  In addition, I felt humiliated by my termination from Zoria Farms after having worked there for so many years and after having built my good reputation.  I also had feelings of helplessness, because I always felt like I was trying to defend myself against others with no success.  I continue to have feelings of helplessness and humiliation to this day.

**b.      Declaration of Maria Sara Monje De Coronado**

Maria Sara Monje De Coronado ("Coronado") began working at Zoria Farms in 1993 as a fresh fruit sorter, which was a temporary position that ran for the length of the season from June through August.  At the end of the 2000 season, she was promoted to work as a packer and sorter in the dried fruit section, which was a permanent position.  In 2006, Ramirez became supervisor of the dried fruit department, and gave orders to Coronado's then-direct supervisor.

Ramirez would routinely threaten female workers that he would fire them if he did not like the job they were doing.  Ramirez would regularly make vulgar comments of a sexual nature, commenting on how female employees looked in their pants and on the size of their breasts.  Ramirez would brush up against Coronado and other female employees and would stare at her private areas.  Although Coronado complained to human resources, her complaint was ripped up and thrown in the trash.  Ramirez then directed Coronado to work outside with hot plums, which is one of the least desirable jobs at Zoria Farms.  On one occasion in 2007, Coronado saw Ramirez as he was trying to grab and kiss Mendez against her will.  Upon seeing Coronado, Ramirez

released Mendez, but he thereafter started criticizing Coronado's work.

In April 2008, Coronado was approached about participating in a meeting with management about Ramirez' conduct, which Coronado ultimately agreed to do. Although Ramirez was fired after the meeting, employees heard rumors that John Zoria had helped Ramirez find a job in the area. Around the time of the meeting, Zoria told employees that the company was going to have a new owner, but he would continue as a partner in the new company, nothing was going to change, and the employees would continue to work for the new company.

In May or June 2008, Zoria Farms was closed for the installation of new machinery. Although employees were told they would all return to work after the installation was complete, this did not occur. Instead, Coronado received a call from her supervisor that there was no more work for her and that she should come to pick up her final paycheck. Coronado soon learned that everyone who had participated in the April 2008 meeting had been fired. Coronado described the emotional and financial consequences of her harassment and the termination of her employment:

> 34. After I was fired, I felt sad and depressed. For several months thereafter, I cried on a nearly daily basis, had a daily loss of appetite, and had difficulty sleeping. I felt utterly humiliated that after working so hard at Zoria Farms for so many years that they decided to fire me. It was particularly humiliating for me[ ] because I had taken pride in both building a good reputation for myself and establishing good relationships with my co-workers, and then, all of a sudden, it was taken away from me. As a result of my feelings of humiliation, I tried to avoid people, including my family members and friends. I did not want to see or talk to anyone like I had previously. In fact, my family members would often scold me, telling me that I should not be behaving how I was behaving and that I would find a new job eventually. I did not feel like the happy, social person I once was. I felt alone and isolated. I also felt helpless and desperate, and I was easily distracted.

> 35. After I was fired, I also felt stressed and nervous. I no longer had a steady stream of income and could no longer pay all my bills. I had to make the difficult choice of either paying for my truck or paying my mortgage. I knew that if I ever wanted to get a job, I needed to keep paying for my truck. Because I no longer could afford to pay all my bills, my credit was negatively impacted. In or around December 2009, I lost my house. The loss was particularly devastating[ ] because before I was fired, I had paid for a new porch to be built and had purchased new trees for my house. When I lost my house, I also lost everything that I had invested into my house . . . The financial stress of it all caused stress in my relationship with my husband[ ] because we no longer had enough money to make ends meet. In addition, as a result of my stress and nervousness, my blood pressure increased and things routinely would fall out of my hands.

### c.      Declaration of Mireya Torres

Mireya Torres ("Torres") began working for Zoria Farms in 1996 as a sorter in the fresh fruit department.   Ramirez, her supervisor, leered at her breasts, made inappropriate sexual references, and asked her personal questions about her life and marriage.   Other female employees confided in Torres that Ramirez was making sexual comments to them and touching them inappropriately.   Torres encouraged these women to report Ramirez' conduct to human resources. Torres witnessed Ramirez harassing Mendez when she saw Ramirez approach Mendez and brush his hand up and over her buttocks.   Torres was upset about Ramirez' conduct towards Mendez and tried to limit the time Mendez would spend alone with Ramirez and started coming into work early.

In the spring of 2008, Torres was approached by Eder Cruz Ortiz about being part of a meeting to complain about how Ramirez was treating female employees.   Torres agreed to participate in the meeting, which took place in April 2008.   At the meeting, Torres told management how Ramirez had treated Mendez, and Mendez also spoke about Ramirez' conduct toward her.  A few weeks after the meeting, Torres was told by human resources manager Martha Sanchez that there was no more work for Torres.   When Torres went to pick up her last check, Torres asked why she was being fired and whether it was because of the meeting.   Ms. Sanchez responded that it was because new ownership was hiring its own new employees.   However, after Torres visited the Zoria Farms facility several times after picking up her check, Torres observed there had been no changes to the employees outside those who had participated in the April 2008 meeting.

As a result of her employment termination, Torres experienced emotional distress for months afterwards.   She felt desperate, helpless, sad, stressed, and anxious about her termination; she felt like she had no value which resulted in a loss of self-esteem; and she was humiliated, embarrassed, and started to prefer staying home, becoming more isolated from her friends.

### d.      Declaration of Bacilia Barajas

Bacilia Barajas ("Barajas") began working at Zoria Farms in 1992 as a fresh fruit sorter. Barajas was promoted to a permanent position in the dried fruit section in 2000.   Barajas enjoyed

his job and was never disciplined for any behavior issues.  After Ramirez became a supervisor in the dried fruit section, his behavior changed and Barajas heard from other female employees that Ramirez was harassing them.  Mendez confided in Barajas about Ramirez' treatment of Mendez. Barajas encouraged Mendez to complain to human resources director Martha Sanchez, which Mendez did, but nothing was done about Mendez' situation.  Barajas witnessed Ramirez harassing other female employees at Zoria, and saw Ramirez grab an employee named Ofelia.   When Ramirez became aware Barajas had witnessed his behavior, Ramirez became more aggressive toward Barajas and would assign Barajas more strenuous work.

In April 2008, Barajas participated in a meeting organized by Eder Cruz Ortiz and Jose Antonio Gieguez where several people described Ramirez' conduct toward them.  Management was present at the meeting.  About a month after the meeting, someone from Zoria Farms informed Barajas not to come back to work until notified.  When Barajas went to pick up her check, Barajas was told there was no more work.  After losing her job, Barajas became depressed and angry.  Barajas attempted to re-apply for work at the new company, Z Foods, but was not even allowed to put her name down on a list.  Barajas explained how her employment termination impacted her:

> 27.  Life changed drastically for me after I was fired.  Financially, I did not have enough for food, rent, clothing or bills.  I did not have enough money so I became late on my electric, gas, and phone bills.  I worried constantly that there would not be enough food for my daughter and two grandchildren.

> 28.  Eventually, I had to ask for help from other people, even my former son-in-law, for help with rent and food.  Relying on other people when I had for so long been independent made me feel depressed.  It drained me emotionally.  Being without work also made me feel tired and bored – there were times I felt so bored, I would start arguing with the dishes at home.

> 29.  I also applied for food stamps for two months.  I only received twenty-two dollars a month in foods stamps.  I was so embarrassed to be applying for food stamps; I had never applied for public assistance in my life, but hunger makes you do things.

Barajas also indicated that her sense of self-worth eroded and she felt humiliated because the company had discarded her.

//

//

22

1

### e.    Declaration of Eder Cruz Ortiz

2       Eder Cruz Ortiz ("Ortiz") began working full-time at Zoria Farms in June 2001 as a dried

3 fruit processor.  He was promoted to the position of packer in 2004, and he was complimented on

4 how quickly he completed his work and was told he was doing a good job.  In 2006, Ortiz was

5 promoted to the position of assistant quality controller, where he was also complimented on the

6 quality of his work.  In 2007, he was again promoted to position of quality control supervisor.  The

7 Plant Manager, Jill Brooks, told him she liked his work, and that he was a responsible, good

8 worker.  In 2006, while employed as the assistant quality controller, Ortiz began to interact with

9 Ramirez.  Ramirez was the general supervisor and oversaw the dried fruit department.  Ortiz

10 noticed Ramirez leering at female employees, and would regularly see Ramirez looking at female

11 employees' breasts, and rubbing against female employees as he would move through the lines of

12 female employees along the conveyor belts.  Ortiz frequently heard Ramirez make inappropriate

13 comments to female employees.

14       Female employees complained to Ortiz about how uncomfortable Ramirez would make

15 them when rubbing up against them or leering at them in a sexual manner.  In April 2008, Ortiz

16 spoke with Jose Dieguez about Ramirez' behavior and they decided to organize a meeting at

17 which the female employees could speak to management about the problems they were having

18 with Ramirez.  Although the women expressed fears about losing their jobs if they spoke out, they

19 agreed to have the meeting.  That same month, a meeting was held with the human resources

20 manager, the plant manager, and the dried fruit employees.  The employees were able to voice

21 their complaints about Ramirez, and they were assured by Brooks and Sanchez that they would

22 not lose their jobs.  Ramirez was fired after the meeting.

23       Around the time of the April 2008 meeting, owner John Zoria informed employees that the

24 company would have a new owner, but he would continue as a partner.  In May or June 2008,

25 Zoria Farms closed for a few days because they needed to install new machinery.  Although

26 employees were assured they would all return to work after the equipment was installed, that did

27 not happen.  After a few days, Ortiz received a call from Human Resources Manager Sanchez

28 informing him that a decision had been made to lay off certain employees, and there was no longer

a job for him.  Ortiz discovered Dieguez had also been fired, and thereafter Ortiz learned that the others who had participated in the April 2008 meeting had been fired as well.   However, other co-workers, many with less seniority, were all called back to work.   When Ortiz sought an explanation from the Plant Manager and the owner of the new company, he was told that certain people had been laid off and there was no work for him.

After being fired, Ortiz felt depressed, sad, and emotional.   He felt embarrassed and humiliated that he had been fired, and started avoiding people, particularly former co-workers. His self-esteem was negatively affected, and he stopped being the same friendly person he had been previously.  Ortiz' relationship with his family members also worsened after his termination. He began to have heated discussions with his wife regarding their finances, how he did not have a job anymore, and about why he had stood up for his co-workers rather than just remain silent. Ortiz had a difficult time obtaining a permanent job after he was fired, and it took him nearly three years to find full-time, permanent work.

### f.      Declaration of Jose Antonio Dieguez

Jose Antonio Dieguez ("Dieguez") began working at Zoria Farms in July 2005 in a temporary capacity.  In June or July 2006, his supervisor recommended him for a position in the dried fruit department, and he was promoted to the position of packer.  His supervisors were pleased with his work.   As a packer, Ramirez supervised the entire dried fruit department. Dieguez witnessed Ramirez constantly looking at female employees' breasts and buttocks, heard Ramirez constantly tell the female employees they were pretty and that he liked them, and heard Ramirez proposition at least one female employee, offering her a better position if she had sexual relations with him.  Although the female employees were upset by Ramirez' unwelcome behavior, they were afraid to complain for fear of being fired.

Dieguez was angry whenever he would witness Ramirez' inappropriate behavior toward the female employees.  Dieguez spoke with Ortiz about Ramirez' behavior and what could be done to help the female employees.  In April 2008, Dieguez and Ortiz organized a meeting where the female employees could explain Ramirez' conduct to management.   Human Resources Manager Sanchez and Plant Manager Jill Brooks were at the meeting.   The female employees

1   explained Ramirez' behavior, and Sanchez and Brooks assured the employees that they should not

2   worry about losing their jobs.  Shortly after the meeting, Ramirez was reportedly fired.

3       Around the time of the meeting, John Zoria announced the company would have a new

4   owner, but that nothing would change and they would all retain their jobs.  In May or June 2008,

5   when Zoria Farms was closed to install new machinery, employees were assured they would all

6   return to work when they had finished installing the equipment.  This did not happen.

7       A few days later, Dieguez received a call from Zoria Farms informing him there was no

8   more work for him.  Dieguez learned that everyone who had participated in the April 2008

9   meeting had been fired.  After his employment termination, Dieguez felt stressed and worried

10  about finding a job.  It was difficult to find work, and particularly stressful because he and his wife

11  had just had a baby.  It took him approximately three years to find stable work.  During the time

12  he was unemployed, his stress caused him headaches three to four times per week.  His

13  relationships with his family and friends changed for the worse.  He and his wife fought regularly

14  because they did not have enough money to pay the bills; he had less patience with his wife and

15  children; and eventually he and his wife divorced.  Dieguez also stopped talking with his friends

16  and former co-workers.  Dieguez experienced humiliation and was less trusting of others and

17  became isolated and withdrawn.  When he finally obtained work, he was afraid of causing

18  problems at his new job, and he did not want to talk to anyone.

19              **g.      Declaration of Arnulfo Guevara**

20      Arnulfo Guevara ("Guevara") started working at Zoria Farms in 1991 as a general laborer

21  during the fresh fruit season at the San Jose facility.  In May 1996, after having suffered an injury,

22  John Zoria, the owner of Zoria Farms, told Guevara he wanted Guevara to work at the Madera

23  facility and paid him an extra dollar per hour.  He was praised for his work, and Zoria would tell

24  him approximately 10 times per year that Guevara was his "right hand man."  Guevara encouraged

25  members of his family to work at Zoria Farms, including his sisters Rocio and Maribel Guevara.

26  Rocio began working at Zoria Farms as a seasonal worker in 2006.

27      Guevara worked with a man named Fracisco Guerra ("Guerra") who eventually was

28  promoted to supervisor in the fresh fruit department and became Guevara's supervisor.  During the

2005 fresh fruit season, Guerra began targeting pretty female employees to have sexual relations with them.  Guerra would instruct the line leads to place the prettiest employees at the end of the line where Guerra would have easy access to them.  Guevara would often catch Guerra standing behind female employees, leering at their behinds as they were working.  Guerra would make comments of a sexual nature to female employees as he walked past them.  Guerra would often talk about how good the female employees smelled, and he would often make comments about their bodies, how good they looked, and how he wanted to have sex with them.  During the 2007 and 2008 season, Guerra admitted to Guevara that he had offered female employees better positions if they had sex with him.  To proposition some of the female employees, Guerra told Guevara that he would use his friends to find out more about the women, and that he liked to be with single mothers because they needed the extra money and were more likely to accept his proposition.

Guerra often promoted the women with whom he admitted to having sex.  Guerra would also call various female employees on their mobile phones during work to meet him at a certain place at the facility.  Guerra bragged about this to Guevara and other male employees to show his power over the women.

In May 2008, John Zoria told Guevara that Zoria Farms was going to have a new owner, but he was going to continue on for the next five years as a partner with the company.  Zoria assured Guevara that everything was going to remain the same.  In June 2008, Zoria Farms was purchased by new owners, who renamed the company "Z Foods."  The upper management remained the same after the ownership change and Guerra was promoted to the position of general supervisor.  After the change in ownership, Assistant Plant Manager Hamlin and Guerra began to exercise more control over the facility.  During the 2008 season, Guerra bragged that he was having sex with a new employee, loudly discussing the different sexual acts and positions in which he put this new employee.  This employee was thereafter promoted where she could earn more money.  Guerra moved Guevara's sister to line leaner, which upset Guevara who knew about Geurra's behavior.

//

1    In October 2008, Guevara reported Guerra's behavior to John Zoria, who continued to
2  work as a manager with Z Foods.  Zoria told Guevara to tell the women to find a way to make a
3  complaint.  Zoria called Guevara back to ask how long it had been going on, and then asked
4  Guevara not to say anything.  In October 2008, Zoria told Guevara that he had told the new
5  owners they should fire the Assistant Plant Manager Hamlin, Guerra's supervisor, but they had
6  refused.  In November 2008, Guevara was told that he had been fired.

7    As a result of his firing, Guevara was humiliated.  Guerra started spreading rumors that
8  Guevara was fired because he had been stealing fruit.  Guevara began having sleeping difficulties
9  and recurring nightmares.  He began to feel anxious and stressed.  He would often wake up in the
10  middle of the night sweating and feeling like he was drowning.  He often had to go outside
11  because he felt like he was suffocating.  His relationships with his family and friends suffered after
12  his termination.  He had difficulty trusting anyone, became withdrawn from family and friends,
13  and became increasingly sad and pensive thinking over and over about what had happened to him.
14  Guevara's self-esteem suffered, he lost confidence in himself and his abilities, and he feared the
15  same thing might happen at another job.  He felt sad and cried multiple times per week.

16    Guevara also experienced a great deal of financial stress after being terminated and had
17  difficulty making ends meet.  Prior to his termination, Guevara had taken out a $7,000 loan, but
18  had difficulty repaying the loan after his termination and interest began to mount.  To help ease the
19  financial stress, Guevara's son started to work in the almond fields during his summer vacation.

20    **h.    Declaration of Carlos Garcia**

21    Carlos Garcia ("Garcia"), Guevara's brother in law, began working at Zoria Farms in June
22  2004 as a sanitation worker.  In 2004, Garcia was moved to a maintenance position.  He never
23  received any job complaints.  While on the job, he heard Guerra make sexual comments about
24  Rocio Guevara.

25    In 2008, Zoria Farms was purchased by new owners, new machines were brought into the
26  facility, and new employees were hired into the maintenance department.  Garcia's work duties
27  remained the same even though there were new machines.  In May 2009, Assistant Plant Manager
28  Hamlin started asking Garcia questions about Guevara and asked whether Garcia knew that

Guevara had filed a charge of discrimination with the EEOC.

In August 2009, Human Resources Manager Joseph Lara called Garcia for a meeting. When Garcia arrived at his office, Guerra was there. Lara gave Garcia a check and told him the company was firing him, but would not tell him the reason.

As a result of being fired, Garcia's family and finances suffered. His wife was six months pregnant at the time and could not work. It took him nearly a year to find a job. Garcia was in the midst of purchasing a home when he was fired, and he lost the financing for the house when he was fired. While he was looking for a new job, his family had to live on unemployment and loans from Garcia's mother to cover the rent, food, and other expenses. His inability to work and having to turn to his mother for help made him feel depressed and helpless. He lost confidence and would constantly fear not being good enough for the jobs for which he had applied. He also started being unable to sleep and would constantly wake up and worry about the lack of money to pay bills.

**i.     Declaration of** ███████████

████████████████████████████████████████

████████████████████████████████████████

████████████████    █████████████████████

██████████████████████████████████

██████████████████████████████████████

████    ████████████████████████████████

█████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

████████████████████████████████████████

██████████████████████   ████████████████

████████████████████████████████████████



//



### 3. Compensatory and Punitive Damages Should be Awarded

As summarized above, each Charging Party has provided evidence of his or her severe emotional distress as a result of the unconscionable actions of Defendant Z Food's supervisors. Accordingly, the Court should award each of the Charging Parties compensatory damages for the emotional distress, pain, and suffering caused by Defendant's discriminatory conduct.

Under Title VII, punitive damages may also be recovered for cases involving intentional discrimination where the complaining party demonstrates that the defendant engaged in egregious discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual. *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526 (1999); 42 U.S.C. § 1981a(b)(1). The statutory cap for Title VII damages is based upon the number of employees for 20 weeks in the calendar year of the discriminatory actions or the preceding year. *See id.*, § 1981a(b)(3); *Slack v. Havens*, 522 F.2d 1091, 1093 (9th Cir. 1975).

Here, the alleged discriminatory actions occurred in 2008 and 2009; therefore, the operative years for determining the statutory caps for damages are 2007-2009. 42 U.S.C.

1    § 1981a(b)(1).  (*See also* Compl.)  Plaintiff has provided evidence that seasonal employees began

2    working during the first or second week of June and continued working through the end of

3    October during these relevant years.  (*See* Sanchez Decl., ¶ 5.)  In responding to the charge of

4    discrimination filed by Guevara, Defendant admitted to the EEOC that they had approximately

5    130 fulltime employees and between 250-300 seasonal employees in 2008.  (Doc. 58-1, Exh. B (Z

6    Foods Position Statement, at EEOC001114-1115).)  Defendant also admitted that applications for

7    the seasonal positions were open in May 2009 and May 2010, supporting an inference that the

8    season began in June each year.  (*Id.*)  Thus, there is sufficient evidence before the undersigned to

9    find that predecessor employer Zoria Farms employed more than 200 but less than 500 employees

10   for a period of at least twenty weeks in the years 2007 and 2008 and that Defendant continued to

11   employ more than 200 but less than 500 employees for a period of at least twenty weeks in 2009

12   and 2010.[2]  Therefore, the applicable statutory cap in this case would be the one governing

13   employers with more than 200 but less than 500 employees.  Plaintiff's request for punitive

14   damages in the amount of $200,000 per individual -- the maximum amount allowed under the

15   statute for an employer with more than 200 but less than 500 employees -- is appropriate.  *See* 42

16   U.S.C. § 1981a(b)(3)(C).

17        Plaintiff has provided evidence that Defendant and predecessor employer Zoria Farms did

18   not have or did not enforce an anti-discrimination policy, failed to take action in response to

19   numerous complaints, and permitted and ratified multiple violations of Title VII prohibitions on

20   harassment and retaliation.  (*See* Decls. of Barajas, Ortiz, Dieguez, Torres, and Guevara (testifying

21   that they never received training or written materials regarding the company's sexual harassment

22   policies or procedures for making a complaint during their employment with Zoria Farms).)

23   Plaintiff has further provided evidence that employees notified human resources employee Martha

24   Sanchez that Guerra was having sexual relations with female employees, Guerra would leave work

25   with female employees, Guerra and Hamlin would make comments about and leer at female

26

27   [2]    Using the second week of June as a start date for each year, twenty weeks from the start date would fall well
     within October.  For example, the second week in June 2007 would start on June 11, 2007, and twenty weeks from
     that date would be October 29, 2007; the second week in June 2008 would start on June 9, 2008, and twenty weeks
28   from that date would be October 27, 2008; and, the second week in June 2009 would start on June 8, 2009, and twenty
     weeks from that date would be October 26, 2009.

1  employees, and that female employees were told if they wanted to continue working with the

2  company, they would have to go out with Guerra.  (Doc. 58-1 (Declaration of Martha Sanchez).)

3        Zoria Farms failed to take appropriate remedial action in response to the comments, and

4  complaints of harassment went unheeded by the company.   Then, in response to certain

5  employees' attempt at an organized meeting to bring their complaints to the attention of

6  management, Zoria Farms chose to repeatedly terminate and Z Foods chose to refuse to rehire

7  those specific employees who had complained and their family members in violation of Title VII's

8  prohibition against retaliation.  (*See id.* (testifying that after the April 2008 meeting, workers were

9  specifically targeted for firing by Zoria Farms and then targeted not to be rehired by plant manager

10 Jill Brooks).)

11       As these intentional acts deprived these claimants of their civil rights, a punitive damages

12 award of $200,000 per individual -- or $1,800,000 total -- is appropriate.  *See* 42 U.S.C. § 1981a.

13 Given that predecessor employer Zoria Farms' owners already settled in the amount $330,000, IT

14 IS RECOMMENDED that successor employer Defendant be held jointly liable for the balance of

15 $1,470,000.

16                    **V.      CONCLUSION AND RECOMMENDATION**

17       Based on the foregoing, IT IS HEREBY RECOMMENDED that Plaintiff's application for

18 default judgment (Doc. 52) be GRANTED and judgment entered be entered in favor of Plaintiff

19 and against Defendant in the amount of $1,470,000 in compensatory and punitive damages.

20       These findings and recommendations are submitted to the district judge assigned to this

21 action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within twenty-one

22 (21) days of service of this recommendation, any party may file written objections to these

23 findings and recommendations with the Court and serve a copy on all parties.  Such a document

24 should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The

25 district judge will review the magistrate judge's findings and recommendations pursuant to

26 28 U.S.C. § 636(b)(1)(C).   The parties are advised that failure to file objections within the

27 specified time may waive the right to appeal the district judge's order.  *Wilkerson v. Wheeler*, 772

28 //

1   F.3d 834, 839 (9th Cir. 2014).

2

3   IT IS SO ORDERED.

4   Dated:   **May 13, 2016**                         /s/ *Sheila K. Oberto*

5                                                   UNITED STATES MAGISTRATE JUDGE